Filed 2/9/23  P. v. Sambrano CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARTHUR M. SAMBRANO,<br><br>    Defendant and Appellant. | F082945<br><br>(Super. Ct. No. CF86346302)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Arthur M. Sambrano appeals after the trial court declined to recall his felony murder conviction and resentence him under Penal Code[1] former section 1170.95.[2] Appellant raises several issues with the evidentiary hearing held in this matter, arguing the court committed procedural errors in accepting and relying upon certain evidence and a substantive error in determining appellant acted with reckless indifference to human life in the commission of the underlying robbery. The parties also dispute the proper standard of review when resentencing hearings are considered exclusively on a paper record. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1986, appellant and a codefendant, David Avila, were charged with the murder and robbery of Michael Bergman (Bergman or the victim). Avila eventually pleaded guilty to first degree murder. After a jury trial, appellant was convicted of both murder and robbery. Appellant was sentenced to 25 years to life on the murder conviction and three years, stayed, on the robbery conviction.

In 2019, appellant filed a petition for resentencing under what is now section 1172.6. In subsequent briefing, the People conceded appellant could state a prima facie case for relief and was not the person that actually killed Bergman, but opposed resentencing on the ground that appellant was a major participant in the robbery who acted with reckless indifference to human life. They sought to prove this fact through three pieces of evidence, a transcript of the preliminary hearing in appellant's case, a copy of this court's opinion affirming appellant's conviction on appeal, and a transcript

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Effective June 30, 2022, the Legislature renumbered then effective section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute at that time, although prior changes had been implemented effective January 1, 2022. There is no dispute in this case that turns on any of these changes. For purposes of clarity, we refer to the statute as section 1172.6.

2.

of statements made by appellant in a recent parole board hearing. Each of these pieces of evidence is summarized below before we recount the court's ruling.

*The Preliminary Hearing Evidence*

The preliminary hearing transcript shows that appellant was bound over for trial based primarily on the testimony of a witness to the crime, a man named Keith Thompson. Thompson admitted to having memory problems and being unable to read, write, and spell to the point of needing special education services. At the time of the incident, Thompson worked at an upholstery shop next door to the liquor store where the murder occurred and had spent the night at work with a coworker to protect the shop's merchandise. Thompson testified that he was outside at around 10:30 p.m. and witnessed the attack on Bergman.

According to Thompson, appellant and Avila were standing outside the liquor store when Bergman arrived in his car. Thompson testified he heard someone say, "Let's go," when the car arrived and assumed it was appellant that made the statement but did not actually see who was speaking. Thompson claimed Bergman parked in the lot and was going through his wallet while sitting in his car when appellant approached and asked for change to buy cigarettes.[3] When Bergman declined to give appellant money, appellant grabbed Bergman by the shirt, told Bergman to give appellant the wallet, and said something along the lines of either, "It's your life or your death," or "Give me your wallet or your life." Bergman continued resisting, at one point, kicking appellant away, and the two struggled for a short period of time over Bergman's wallet.

---

[3] Notably, Thompson also stated he was aware Bergman went into the store and bought groceries before the incident. He claimed to know this based on conversations with the store clerk and information gleaned from a police report, which Thompson later stated he had not read but had seen some pages. Thompson denied seeing Bergman enter the store and consistently stated the robbery occurred after Bergman pulled into the parking lot and opened his car door.

While this interaction was occurring, Avila remained back where he and appellant had been previously been standing. After a few moments, Thompson saw Avila approach the vehicle carrying what appeared to be a knife. Avila came up to where Bergman and appellant were struggling and, in the course of a second or so, reached both hands into the car. At this point, appellant obtained control of the wallet and both appellant and Avila walked away. Thompson testified he heard someone say something like, "I got it. Let's go," when they gained control of the wallet. In the course of Avila's actions, Thompson did not hear any conversations between appellant and Avila, did not see appellant gesture to Avila, and never saw appellant with a weapon. The entire robbery and stabbing was estimated to take somewhere between seven and nine seconds.[4]

Thompson testified that while it did not immediately appear that Bergman was hurt, Thompson saw Bergman drive away in an erratic fashion while holding his chest. Bergman's girlfriend testified that she found Bergman dead in her driveway, a short distance from the store, around 10:00 p.m. The parties stipulated that Bergman died from a single stab wound to the left side of his chest that pierced his heart.

Thompson testified that he informed his coworker someone had been robbed and that his coworker responded by chasing after appellant and Avila with a baseball bat. While the two fled, Thompson stated he saw appellant search through Bergman's wallet and throw paper from it into a bush. Thompson conceded he had searched the area with the police for whatever was thrown and did not find it.

With respect to the overall scene, Thompson noted it was not a busy night at the liquor store, that no one else arrived during the time of the robbery, and that traffic was generally light. Thompson explained this was not typical, as most nights the area was

---

**4** In later testimony, Thompson claimed Bergman's car had been parked for close to 20 minutes and that Bergman had been sitting in the car for nearly 10 minutes while sorting through something. Thompson later backtracked, suggesting it was more than three minutes and anywhere from five to 20 minutes.

busy and people were around. Thomson also provided an opinion that appellant appeared to be high on "dust" during the incident.

Although Thompson provided the core testimony, the People also tried to introduce evidence through appellant's cousin and Avila's girlfriend, Margaret Carlos. Carlos was generally uncooperative, claiming to recall very little because she had been under the influence of drugs. Carlos specifically denied making several statements to police about the incident. Carlos did eventually admit that appellant and Avila had gone to the liquor store to make a phone call and buy a soda the night of the robbery.

The People then called a police officer to testify to the statements Carlos claimed not to have made. In this testimony, the officer recounted that Carlos claimed appellant had arrived at her apartment with a wallet, a bloody knife, and blood on his hands. At that time, Carlos claimed appellant had admitted to stabbing someone. Carlos also claimed, however, that it was Avila who had the knife and wallet, and that Avila had admitted to stabbing someone after being kicked during a robbery.

The officer also spoke to appellant. In that conversation, appellant denied stabbing anyone and stated he did not see Avila stab anyone either. Appellant admitted to being at the liquor store but claimed it was Avila that approached Bergman first. Appellant stated he had gone over to Bergman's car after Bergman kicked Avila to assist in what he thought was a fight between the two.

In its ruling, the trial court recognized that the evidence included two differing factual scenarios but found probable cause existed to hold over both appellant and Avila on murder and robbery charges. It then noted it did not need to resolve the factual dispute with respect to an alleged enhancement for use of a knife because it "appear[ed] that [the] Court [was] in a position to find sufficient probable cause based upon differing versions of the evidence, that there [was] a basis for the People to charge that in Superior

5.

Court in the alternative obviously based upon the facts both of them cannot be found to have had personal use of a knife based upon the evidence adduced here."

*The Conviction and Original Appeal*

Appellant was eventually tried and convicted of murder and robbery. He appealed that conviction, and in a nonpublished opinion (*People v. Sambrano* (March 1, 1989, F008032)), this court affirmed. In the course of this court's opinion, we provided a case and factual summary of the evidence adduced at trial. We repeat those summaries here.[5]

In the statement of the case, this court wrote:

"Appellant and David Avila were charged with murder with the use of a knife. (Pen. Code, §§ 187, 12022, subd. (b)) and with robbery (Pen. Code, § 211).

"Avila pleaded guilty to first degree murder.

"Appellant's first trial ended in a mistrial following reports by potential jurors that prosecution witness Keith Thompson was making statements concerning the case.

"During the proceedings to impanel a new jury, appellant made a *Wheeler* motion (*People v. Wheeler* (1978) 22 Cal.3d 258), which was denied.

"The jury found appellant guilty of first degree murder and robbery. He was sentenced to 25 years to life for the murder and granted presentence custody credit for 243 days time served and 121 days good time/work time. A three-year sentence imposed for the robbery was stayed.

---

[5] Appellant challenges the use of this evidence in his resentencing proceedings. With respect to the facts provided, we include these facts only for background concerning the nature of appellant's conviction and the proceedings below. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 292, quoting § 1172.6, subd. (d)(3) ["effective January 1, 2022, the Legislature limited use of prior appellate opinions, allowing trial judges to 'consider the procedural history of the case recited' "]; see also *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9 ["Senate Bill [No.] 775 [(2021–2022 Reg. Sess.)] prevents a trial court from relying on facts recited in an appellate opinion to rule on a petition under section [1172.6]."].) By doing so, we take no position on the admissibility of these facts in light of the case law noted.

"Appellant makes multiple contentions on appeal, none of which have merit with the exception of the question of presentence custody credits. We order the Director of Corrections to award appellant the correct number of days credit and affirm the judgment." (Italics added & underlining omitted.)

For the statement of facts, we wrote:

"Keith Thompson testified that on the night Michael Bergman was killed, he saw two men standing near the ice machine in front of Jack's Liquor Store. He stated that one man was taller than the other and that the taller man was wearing a blue shirt. Thompson was employed by an upholstery shop located next to the liquor store.

"Thompson stated that after the victim's car drove up to the liquor store, he saw the taller man go over to the car, place the palm of his hand on the window and ask the victim if he had any loose change. He next heard the taller man say, '[W]ell, give me your wallet.' The two men then struggled over the wallet.

"During this struggle, the second man left the ice machine and approached the driver's door. The second or shorter man stuck his head inside the car. The shorter man's left hand went inside the car. The taller man then pulled the wallet out and said, '[W]e got it, let's go.'

"Thompson went into the upholstery shop and told his coworker, Martin Gamez, that someone was being robbed. They ran outside and saw Bergman drive away at a high rate of speed. Gamez saw the two suspects across the street. After Gamez shouted at the two men, they started running. Gamez chased the suspects for several blocks before losing them in an apartment complex.

"Bergman's body was found lying in front of his vehicle in his girlfriend's driveway. He died from a single stab wound to his chest. Appellant's left palm print was found on the driver's door window of Bergman's car.

7.

"Sophia Villarreal also observed the robbery take place. She testified she noticed two men by the ice machine in front of the liquor store. The taller man was counting money. After Bergman came out of the store, she saw the shorter man follow him to the car and lean inside. After a few minutes, the taller man approached the car and just stood there. Shortly thereafter, the two men took off running, and the car drove away quickly. Villarreal identified appellant as the taller man.

"Cruz Subia, appellant's cousin, testified that he, appellant, appellant's wife and Maria Reyna were staying at his cousin Margaret Carlos's apartment along with Carlos's boyfriend, Avila. Subia testified that Avila was the first to return to the apartment after he and appellant left to go to the store. Avila looked scared and was breathing hard. Avila went to the kitchen and began washing blood off a knife. A few minutes later, appellant returned also looking scared. Appellant asked Avila what happened, and Avila responded, 'I stabbed some guy and took his wallet.' Subia took the wallet from Avila and burned it. Subia testified that appellant told him he had not known what was going on. Appellant stated that when he told Avila he did not have enough money to buy beer, Avila asked someone for money and then started fighting with this person. Appellant did not say he was involved in the fight in any way.

"Maria Reyna was also present at the apartment when Avila and appellant returned. Avila was the first to return and began washing blood off a knife and out of his shirt. She heard Avila say he stabbed someone and took his wallet. Reyna stated she never saw appellant with the wallet.

"Appellant testified that Avila followed him to the liquor store. After arriving at the store, appellant stood in front and counted his change. Avila asked him to buy a 40-ounce beer[,] but appellant did not have enough money. When the victim walked out of the store, Avila approached him to ask for change. Avila and the victim started fighting. Appellant walked over to the car and put his hand on the window. He intended to either

break up the fight or help Avila out. However, as soon as he arrived[,] both Avila and Bergman left quickly. Appellant started running but then stopped, realizing there was no reason to run, and walked back to the apartment.

"Appellant stated that when he arrived at the apartment, Avila was washing blood off of his knife and his hands. When appellant asked Avila what happened, Avila replied, 'I stabbed and took that guy's wallet.' Avila pulled out the wallet and handed it to Margaret Carlos. Appellant refused to have anything to do with the wallet and disclaimed any involvement with it."

On appeal, appellant raised issues with jury selection, two evidentiary rulings by the trial court, the sufficiency of the evidence, and the calculation of presentencing credits. One of the evidentiary rulings concerned appellant's desire to cross-examine Thompson on the statements that led to the initial mistrial. Thompson believed these statements showed Thompson as the type that would "exaggerate and misstate facts to ingratiate himself to individuals whom he believes he can become important to." This court found no error because other testimony regarding this point had been introduced through the prior juror's themselves. With respect to the sufficiency argument, this court explained that "[a]ppellant testified that he was at the liquor store when the murder and robbery took place. Thus, the issue before the jury was whether appellant was involved in the crime. Keith Thompson's testimony supported the jury's determination that appellant was involved. Although Thompson's testimony was contradicted by other witnesses and there was testimony that his reputation for truth was poor, the jury decided he was credible. The matters to which Thompson testified were neither physically impossible nor demonstrably false without resort to inferences or deductions. [Citation.] Therefore, the jury's finding is binding on this court." As, noted, this court ultimately affirmed the conviction but modified appellant's presentence custody credit.

*The Parole Hearing Evidence*

In 2018, appellant testified in a parole hearing.[6] During that testimony, appellant made several statements about the crime underlying his conviction.

Initially, appellant indicated that he had gone to the store knowing he did not have enough money but figuring he could take by force what he needed from anyone that arrived. Appellant affirmed that he had gone to the store with Avila but stated he did not know Avila had a knife and that he had not made any plans with Avila regarding a robbery. Appellant acknowledged, "I robbed [Bergman], my crimie[, Avila,] stabbed him," and conceded his admission of the robbery was a recent change in his statements. But appellant also explained, "[E]verything happened so quick it was just—it wasn't planned, it just came—it just happened like that. And to this day I—I'm just like I could've done something else instead of that." According to appellant's various statements, he did not go to the store with a direct plan to rob anyone and did not have any previous discussion with Avila about doing so, but he did decide to get money from Bergman in the moment and conceded he "wasn't going to take no for an answer." Appellant conceded he would likely have assaulted Bergman even if Bergman did not have any money.

As the interview proceeded, appellant stated that Avila was the first to approach Bergman and that appellant only intervened after he thought the two were fighting. Appellant claimed he only learned of the stabbing once the two were back at Carlos's apartment and Avila told him what happened. He ultimately claimed he was guilty of being in the wrong place at the wrong time.

---

**6**    Appellant also challenges the use of this evidence in his resentencing proceedings. Our recitation of these facts is for background and context and does not indicate that they were properly admitted.

10.

*The Resentencing Evidentiary Hearing and Ruling*

After admitting the above evidence, the trial court heard argument from the parties and denied appellant's petition for resentencing. During argument, the court acknowledged that Carlos "was all over the place and had to be impeached in order to elicit any testimony," and that appellant was not charged with "malice murder." In ruling, the court conceded it had read and relied upon the preliminary hearing transcript, the Court of Appeal opinion, and the parole hearing transcript that had been introduced. The court then identified several factors it can consider when determining whether a defendant acts with reckless indifference to human life and whether a defendant is a major participant in an underlying felony.

Following its identification of these factors, the court provided a thorough recitation of the facts of the case, as found in the multiple documents it considered. Interspersed with its recitation of the facts were references back to several of the factors the court can consider for both the major participant and reckless indifference to human life considerations, along with commentary about how the court viewed certain witnesses and their testimony.

With respect to the major participant finding, the court found the evidence showed appellant's "role and planning was manifest and apparent." However, the court noted that "[t]here was no evidence that [appellant] supplied or used a lethal weapon" and "no evidence about any dangers posed or past experience of conduct by the other participant, Mr. Avila." Looking at the evidence concerning how Bergman was ultimately stabbed, the court determined appellant "was in a position to prevent the death" because while appellant "could have simply just waived off Mr. Avila," he instead continued with his efforts to obtain the wallet when Avila approached. Similarly, the court focused on the fact appellant left with Avila after the stabbing, accepting Thompson's testimony on this point despite the fact he was generally impeached based on memory issues. Overall, the

11.

court focused on its findings that accosting Bergman in his car and preventing him from exiting meant appellant's "actions acted as a resisting influence" that "played a particular role in Mr. Bergman's death."

The court then turned to the reckless indifference to human life element. Stating first this was the "closer issue for the Court," the court began by noting "that there is no evidence that [appellant] knew a lethal weapon would be present during the robbery" and "no evidence that he knew that a lethal weapon was likely to be used." The court then recited preliminary hearing evidence from Carlos concerning events before and after the attack, whom the court had found fully impeached, before reviewing conflicts between appellant's version of the events and Thompson's testimony that appellant had been the initial aggressor.

Finding there was "a lot of overlap with regards to the major participant aspect of this case," the court specifically identified the fact appellant "was present at the scene," accepted Thompson's preliminary hearing testimony and appellant's concession at the parole hearing that appellant was the initial aggressor, and recalled appellant's statement to Bergman of, "It's your life or your death," in the face of Bergman's refusal to provide his wallet. The court reasoned these facts demonstrated "a mental state above and beyond merely a passive participant," one "approaching reckless indifference to human life." Reviewing the general scope of Thompson's preliminary hearing testimony, the court determined appellant did not "try to minimize the possibility of violence" but rather said, " 'Give me your wallet or your life.' " Likewise, the court found appellant "put Mr. Bergman in a vulnerable position" when he "essentially trapped Mr. Bergman in the driver's seat of his vehicle during the robbery[,] ensuring that Mr. Bergman would not escape as [appellant] stood by in the doorway of the car." Summarizing the scope of its findings, the court found appellant acted with reckless indifference to human life by "noting that there was no evidence that [appellant] knew of this objective knowledge of a

knife being used, but also noting that he was present there during the time and he was in a position [to] see and facilitate the underlying robbery."

This appeal timely followed.

## DISCUSSION

Although several disputes over the procedural processes for reviewing a trial court's ruling following an evidentiary hearing exist between the parties, underlying those issues is a fundamental question whether the evidence introduced by the prosecution is adequate to demonstrate appellant could have been convicted of felony murder under the standards currently employed. We note these underlying disputes at the outset because, upon review of the record, we conclude the evidence was sufficient to convict appellant of felony murder under any potential standard of review and regardless of the scope of evidence that could be properly considered. We therefore focus primarily on the preliminary hearing evidence offered to show appellant was a major participant who acted with a reckless indifference to human life and do not reach those procedural disputes raised by the parties which are not ultimately necessary to resolving this matter.

*Standard of Review and Applicable Law*

Section 1172.6, subdivision (a) provides that one convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime may file a petition to have the conviction vacated and to be resentenced on any remaining counts when (1) an information was filed against the petitioner that allowed the prosecution to proceed under a theory under which malice is imputed to a person based solely on that person's participation in a crime, (2) the petitioner was convicted of murder after either a trial or accepting a plea offer in lieu of a trial, and (3) the petitioner could

13.

not presently be convicted of murder or attempted murder because of changes to section 188 or 189.

Relevant here, "section 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' (Pen. Code, § 189, subd. (e)(1)) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'—that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

Returning to the resentencing statute, if a petitioner makes a prima facie showing for relief, the trial court "shall issue an order to show cause." (§ 1172.6, subd. (c).) At this point, the court must "hold a hearing to determine whether to vacate the murder … conviction and to recall the sentence and resentence the petitioner on any remaining counts." (§ 1172.6, subd. (d)(1).)

Several procedural rules are specifically provided for the show cause hearing. As set out in section 1172.6, subdivision (d)(3): "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of

14.

Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.  A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.  If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."

Under the existing rubric used in these matters, we "review the trial judge's factfinding for substantial evidence.  [Citation.]  We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." '  [Citation.]  Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt."  (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 298, second bracketed insertion in original.)[7]

---

[7]    Appellant, relying on the analysis contained in *People v. Vivar* (2021) 11 Cal.5th 510, argues this standard rubric is improper where the underlying evidence is a paper record recounting events from many year's past.  Although this court considers *Clements* as the controlling law, we have also independently reviewed the evidence.  As our opinion would not change regardless of the standard of review, we take no position on the effect *Vivar* may have on paper-record cases that require no in-person credibility determinations.

*Major Participant Finding*

As noted above, under the current statutory scheme, "[d]efendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'—that is, the statute defining the felony-murder special circumstance." (*People v. Strong*, *supra*, 13 Cal.5th at p. 708, first bracketed insertion added.)

To be a major participant in the underlying felony, "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*People v. Banks* (2015) 61 Cal.4th 788, 802.) "The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations].' '" (*People v. Clark* (2016) 63 Cal.4th 522, 611 (*Clark*).) The following factors may be relevant to a determination of whether a defendant was a major participant in a felony murder: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted; accord, *Clark*, at p. 611.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks*, at p. 803.)

Appellant raises a challenge to the trial court's finding that he was a major participant in the underlying robbery. Focusing on evidence appellant argues shows a

lack of connection between appellant and Avila and a lack of knowledge Avila was armed or dangerous, appellant argues that "the court erred in concluding beyond a reasonable doubt that appellant was a major participant in the incident resulting in Bergman's murder." We do not agree.

We readily conclude that appellant was a major participant in the underlying felony, a robbery. The evidence shows he initiated the robbery, actively engaged in attempts to complete it, and participated in retrieving and leaving with Bergman's wallet. Appellant was therefore far removed from a standard aider and abettor. Rather, he was the primary actor in the underlying felony up until the point the murder occurred and continued to participate after the murder.

While appellant's argument infers that he must be a major participant in not only the robbery but also the actual killing, this requirement is not in the statutory language and we see no evidence such a specific finding is required by the case law. Rather, the major participant analysis often overlaps with and is related to the reckless indifference to human life analysis, which focuses on determining culpability for a killing that occurred because of choices and conduct made in effectuating the underlying felony. (See *Clark*, *supra*, 63 Cal.4th 522 at p. 615 [although the requirements are stated separately, " 'they often overlap' "].) We further develop the reckless indifference point, below. In doing so, our conclusions strongly support not only finding that appellant was a major participant in the robbery generally, but also that he knowingly engaged in a cooperative robbery with Avila which raised the inherent risk of harm to human life. Accordingly, we find no error in the trial court's determination appellant was a major participant in the underlying robbery.

*Reckless Indifference to Human Life Finding*

What it means to be a major participant who acts with a reckless indifference to human life under section 189 is a heavily analyzed issue. Our Supreme Court provided

17.

an excellent summary of the law as part of *In re Scoggins* (2020) 9 Cal.5th 667. The general framework for analyzing the issue is well settled, a point recognized by the trial court, but turns on a "fact-intensive, individualized inquiry" for the case. (*Id*. at p. 683.) We therefor provide a general review of the analytical framework for this issue before considering the facts of this case.

The reckless indifference analysis considers the totality of the circumstances surrounding the crime to determine whether the accused acted in a manner that created a grave risk of death. As explained by our Supreme Court, in general, a reckless indifference to human life "is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.] Examples include 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' [Citation.] Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' " (*In re Scoggins*, *supra*, 9 Cal.5th at pp. 676–677.) However, " '[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Id*. at p. 677, first & third bracketed insertions added.)

The test considers the facts from both objective and subjective perspectives, considering both as relevant elements in the analysis. "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the

significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677, second bracketed insertion added.)

When considering the evidence in its totality, from both objective and subjective perspectives, our Supreme Court has identified several questions that explore relevant factors in the analysis. No one of these questions is dispositive of the issue, nor is any necessarily sufficient to prove a reckless indifference to human life existed. However, given their usefulness, we begin by reviewing them in the context of the evidence of this case.

The questions are: "Did the defendant use or know that a [weapon] would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)[8] We therefore consider the facts of this case in

---

[8] An additional potential factor, identified in *In re Moore* (2021) 68 Cal.App.5th 434, 439, is the defendant's youth at the time of the offense. Appellant argues this factor weighs in favor of finding no reckless indifference to human life. However, the defendant in *In re Moore* was only 16 years old (*id*. at p. 454), while appellant in this case was 21 years old at the time of the robbery and thus not an adolescent. *In re Moore* draws a clear line between "juvenile" offenders and "adult" offenders that is not triggered by appellant's age. (*Ibid*. [noting evidence sufficient to find reckless indifference for an adult insufficient for less mature children].) Accordingly, although *In re Moore* was not decided at the time of appellant's evidentiary hearing, we conclude a remand is not necessary for consideration of this potential factor. (Contra, *People v. Jones* (2022) 86 Cal.App.5th 1076, 1093 [remanding in the interest of justice only].) Appellant's

light of these guiding questions to determine whether the evidence supports a conclusion that appellant acted with a reckless indifference to human life.

As the trial court recognized, some of these factors counsel against a finding that appellant acted with a reckless indifference to human life. For example, there is no direct evidence that appellant was aware Avila had a knife[9] or was likely to use a knife in the course of the robbery, and no evidence appellant knew of any propensity for violence from Avila.

Other factors are generally neutral given the evidence submitted to the trial court. For example, evidence regarding the duration of the robbery does not directly support either side of the reckless indifference to human life analysis. While the evidence indicates the entire interaction was relatively brief, the testimony does show that there was an initial verbal indication from appellant that he was going to engage in a robbery, a period of time in which appellant walked over to Bergman, spoke with him, and actively tried to obtain Bergman's wallet—a time period which included sufficient time for Avila to potentially hear appellant's "your wallet or your life" comment and travel from his location to the robbery—and a brief period where both engaged in robbing Bergman.

---

citation to section 3051, which grants parole hearings to youthful offenders under the age of 26 years, does not convince us otherwise. Appellant cites no authority that persuades us we should extend the assumption that a minor's maturity and judgment is undeveloped to persons beyond the age of 18 years. Rather, the age of 18 years is generally considered " 'the point where society draws the line for many purposes between childhood and adulthood.' " (*Graham v. Florida* (2010) 560 U.S. 48, 74.) Accordingly, we assume the court properly considered appellant's age and maturity in the totality of the circumstances analysis typically required in this case. (See *In re Julian R.* (2009) 47 Cal.4th 487, 499 [trial court is presumed to have been aware of and followed the applicable law].)

[9]   The only indication that appellant knew of a knife came from Carlos's internally inconsistent testimony that it was appellant who returned with a bloody knife and bloody hands, indicating he had been the attacker. No party argues this testimony was true, and it was contradicted not only by Carlos but by all other evidence in the case. The trial court recognized the problems in Carlos's testimony and did not appear to consider it reliable. We, likewise, would also discount Carlos's testimony in an independent review.

Although the time involved was not prolonged, it was sufficient to provide a greater opportunity for violence, as strongly evidenced by the fact Avila could observe the interaction and then choose to intercede while it was still occurring. (See *In re Scoggins*, *supra*, 9 Cal.5th at pp. 680–681 [finding a three-to five-minute period is not a prolonged period but noting the relevant question is whether the period of time provides a greater window of opportunity for violence, possibly culminating in murder].)

Based on these factors, the core question in this case is how to view the remaining factors related to appellant's presence and actions during the robbery with the generally neutral or exculpatory factors discussed above. The trial court's analysis concluded that appellant's presence and actions during the robbery were sufficient to show a reckless indifference to human life. Upon review, when looking at appellant's presence at the robbery, his opportunity to restrain the crime or aid the victim, and his efforts to minimize the risks of violence, we agree with the trial court's conclusion.

The trial court's recognition that appellant was present at the scene of the stabbing is well supported by the record, as there is no meaningful dispute appellant was engaged with Bergman at the time Avila acted. This fact differentiates this case from many of those finding no reckless indifference, which typically include facts suggesting that the defendant was across the street or otherwise meaningfully removed from the conduct when the killing occurred. (See *In re Scoggins*, *supra*, 9 Cal.5th at pp. 678–679 [noting the defendant was across the street at time of shooting and contrasting that with cases where the defendant was present during the entire sequence of events]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405 [the defendant was several feet away, with cars between him and the shooting]; *In re Moore*, *supra*, 68 Cal.App.5th at p. 452 [the defendant sat in car during shooting].) As our Supreme Court has recognized, the case law stresses "the importance of presence to culpability" particularly because proximity to the murder and

events leading up to it can demonstrate the murder is a culmination or foreseeable result of several intermediate steps. (*Clark*, *supra*, 63 Cal.4th at p. 619.)

The preliminary hearing evidence in this case contains meaningful evidence supporting the conclusion that Bergman's death was a foreseeable consequence of several intermediate steps. The record shows appellant present at the scene with Avila before the robbery. Upon the start of the robbery, a witness heard communication between appellant and Avila, the comment, "Let's go." Appellant then proceeded to Bergman's car and attempted to take his wallet. When that initially failed, appellant stated, loud enough to be heard, something similar to "Give me your wallet or your life." After this comment, appellant reengaged with Bergman and struggled to obtain his wallet. As this struggle continued, Avila, who had remained behind during the "Let's go" and "Give me your wallet or your life" comments, left his position and came to appellant's aid. In doing so, Avila reached into the car where appellant had cornered Bergman and stabbed him. Immediately after, the two communicated again through the comment, "I got it. Let's go," before the two fled together, with appellant looking through Bergman's wallet as they left.

The evidence permits the reasonable inferences that appellant and Avila were engaged in a coordinated robbery, that appellant's actions and comments throughout increased the risk that Avila would engage as well as the risk of lethal action occurring, and that Avila's eventual participation was not only predictable but welcomed by appellant. Such inferences are sufficient to demonstrate substantial evidence supports the trial court. (*People v. Grant* (2020) 57 Cal.App.5th 323, 330 [" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' "].) Coupled with the evidence discussed above, this court is also independently convinced that appellant exhibited a reckless disregard for human life in the course of the robbery. Appellant did not act as if Avila's participation was

unexpected or unwelcome and, coupled with his express threat to Bergman's life, did not seek to limit the potential for violence by ceasing his conduct when it initially failed, calling off Avila when he interceded, or breaking away from Avila after his interjection allowed appellant to obtain Bergman's wallet. His extensive, cooperative conduct throughout the robbery showed a conscious disregard of a substantial risk of death occurring in the robbery.

In line with this analysis, the factor considering appellant's efforts to minimize the risks of violence also tends toward finding a reckless indifference to human life. Even accepting that the evidence does not demonstrate appellant knew Avila was armed, the overall evidence generally shows a plan to engage in a cooperative robbery in a public space. The cooperative nature of the plan, appellant's conduct in confronting the victim in the enclosed and controllable space of his car while threatening his life, and the fact the robbery occurred at night all work to increase the risk of violence over other possible robbery plans. This is particularly so given the unpredictable nature of a cooperative robbery in a public place, where discovery of the criminal act could immediately increase the likelihood of being caught and thus the need to engage in reckless conduct to succeed.

Regardless of how this court conducts its review of the record, the end result is that the evidence submitted to the trial court demonstrates appellant acted with a reckless indifference to human life. There is substantial evidence tying appellant to a cooperative plan to commit an unarmed robbery and to specific steps in the course of the robbery that increased the risk of death, such as the manner in which appellant confronted the victim and the statements made just before and during the robbery. Ultimately, the analysis in these cases consists of a "fact-intensive, individualized inquiry." (*In re Scoggins*, *supra*, 9 Cal.5th at p. 683.) Here, appellant actively led the robbery, made threats to Bergman's life, was present for the stabbing, and fled with his partner. While some of the factors weigh in appellant's favor, the overall facts concerning the robbery planned and executed

23.

in this case demonstrate the reckless indifference to human life required to affirm the trial court's order.

*Evidentiary Issues*

Having concluded that the evidence supports the trial court's order, we briefly consider and reject appellant's argument the trial court erred by relying upon the preliminary hearing transcript to support its conclusion. The cases cited by appellant which reject reliance on the preliminary hearing transcript to reject a petition for resentencing arise in the context of the prima facie eligibility determination, where the trial court is generally not permitted to resolve factual disputes. (See *People v. Davenport* (2021) 71 Cal.App.5th 476, 481–482 [although preliminary hearing transcript is part of the record of conviction, the trial court engages in impermissible factfinding at the prima facie stage if it resolves factual disputes by relying on unstipulated facts from the hearing].) At the following evidentiary hearing the trial court is not precluded from weighing evidence and making factual findings. In that context, the statutory scheme specifically permits use of the preliminary hearing transcript with some restrictions and this court is aware of no authority precluding the trial court from considering properly admitted evidence. (See § 1172.6, subd. (d)(3) ["The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.… However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule."]; *People v. Davenport*, *supra*, 71 Cal.App.5th at p. 485 fn. 3 ["the prosecution may, at the section [1172.6] hearing that will occur upon remand, rely on the preliminary hearing transcript to sustain its burden of establishing that he is not entitled to relief"].)

24.

We also reject appellant's claims of error in admitting this court's prior unpublished opinion and statements made in appellant's parole hearing. We evaluate the erroneous admission of evidence at a section 1172.6 evidentiary hearing under the harmless error standard for state law error articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Myles* (2021) 69 Cal.App.5th 688, 706 [considering potential error in admitting parole hearing transcript].) " 'Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred.' " (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447.) Even if we assume the opinion and transcript were improperly admitted, any error was harmless. The evidence submitted from the preliminary hearing was sufficient, standing alone, to support the trial court's ruling on all relevant issues. In fact, to the extent these additional documents were submitted, the facts contained within them tended to benefit appellant by minimizing his connection to Avila or implying he never intended to commit anything other than an unarmed robbery. It was thus not reasonably probable a different result would have occurred had the additional evidence not been admitted.

## DISPOSITION

The order denying appellant's petition is affirmed.

HILL, P. J.

WE CONCUR:

DETJEN, J.

SNAUFFER, J.

25.